We will hear argument next in number 221896, In Re Institut Pasteur. Mr. Arrigo? Is that Arrigo? Arrigo. Thank you. May it please the Court. Unexpected results are an integral part of the obviousness determination. Thus, as set forth in Graham v. Deere, unexpected results must be considered to determine whether Re Institut Pasteur's claim method is obvious. In the context of looking at unexpected results, don't you have to look at the closest prior art and compare the claimed invention to the closest prior art? Yes. I think you certainly do need to compare it to the closest prior art, and the closest prior art in this particular case is methods, methods of use with morphine. Why morphine? Because morphine was, I think, if you look at the declaration that was submitted in this application. But why is that the closest prior art? Why isn't, like, the PCT, from which the patent that's being the comparison patent drives its priority, a 102B reference for the claims here? Because the claims here are method claims, and if you look at the prior art, the method claims in the prior art never performed the method that we are claiming. But they did have the same, it wasn't morphine, right? It was the other... It's exactly the same compound that we're talking about. It's the exact same compound. So why do I have to look at morphine instead of the exact same compound? If the closest prior art is the exact same compound? Because it's not the closest prior art to the claimed invention. The claimed invention is a method. And if we take a look and compare the two applications, two applications are both from Institute Pasteur, and that's, we have a double patenting issue here. The first application discovered opioids, and it had pain, that you could treat pain with it, generally. Now that's fine, and treating pain is a good thing, but morphine was available. The problem with treating pain, and I think that's actually well laid out in the declaration, if you look at in the prior art, one of the big issues with treating pain is pharmacodependence and tolerance. If you treat a patient with morphine, they get addicted to it. You need to use more of it. They have this tolerance and this pharmacodependence, it's difficult to get them off of morphine. So what we're looking for is a substitute for morphine. If you look at the earlier application, it says you can treat pain. It seems to go through some of the same receptors as morphine. So the expectation in the art was that it would be like morphine, that you'd have these problems with pharmacodependence and tolerance. That was the expectation in the art. So if you think about the method of treating a person for seven days with a certain amount of it, over those seven days, the expectation, again this is supported in the declaration, was that that person would develop pharmacodependence and tolerance. This case is an obvious mis-type double patenting case, right? Do you agree though that the reference, the PCT reference that I was referring to before, that's actually 102B prior art in this case, right? Could it be used as a 102? It was not used as a 102. It's not, but it could be, right? I don't see any reason why it couldn't have been used as a 102. Okay. No, it's actually brought up in the record many times that we said this is not a 103 rejection. I don't think it changes the analysis at all. Because again, you have to look at unexpected results. I don't know if it makes a difference, but I'm just thinking about it in terms of, again, this closest prior art argument that you're making about how, because the claims, I guess, that are being compared to the claims at issue in this case weren't a method, but it seems that there is some reference to method in the prior art reference. So that might be the closest prior art. But if you look at what's in the prior art, and is actually done in the prior art, it's treatment one time. There is no, it's a genus in the prior art, treat pain. We're talking about a very specific species in our claim that has specific duration, that has specific amounts being delivered to a person per day. I'm sorry, I think I'm a little confused. Maybe you can help me out. Yes. I thought you started off by saying for purposes of unexpected results, you compare to the results of morphine. Now I hear, I think I hear you saying the comparison is between the application of claims here that are at issue and the 871 claim, which is not about morphine. It's about opiorphine. In terms of the claims themselves? A method, right. So for unexpected results, what's the comparison? Well, the comparison has to be to the closest prior art. I'm sorry, is the closest prior art the 871 claim? To figure that out, what do we compare it to? If we say that this patent is the closest prior art, they didn't, it was never used in terms of the amount. I just want to be clear, this patent, you mean the 871? Yes. If we talk about that prior patent, it was never used over a period of time. Pharmacodependence and tolerance, which are recited in the claim, are not in the prior art. There was never any treatment over time in the prior art. All there is in the prior art is a broad claim that says treat. And if you look at the examples in the prior patent, what you find is that all they did was they used this opiorphan one time with a mouse and saw that it reduced pain. They didn't do any of the studies that they did in the later application, which is the one that we have on appeal here. Do you have the appendix with you on the change? I do, I do. Page 448, I'm looking at the Rouge Declaration. Yes. It seems to me that it's important to be able to establish that these unexpected results were not known in 2008. Correct. Data point, right? Yes, I believe that's the filing date. They were not known in 2008, okay. So if you look at appendix 85, there is here a declaration that opiorphan was known to have these unexpected results in 2007. You look at 85, page 37 of the PCP. I'm sorry. It says that Rougeau disclosed to the public in 2007 that these unexpected results can be expected in 2007. Which page? Page 85 of the appendix. Page 85 of the appendix, okay. It says they're 2007, and then it's referring to the formalin test, and if you look at the 871 patent in column 32, you see the formalin test was in 2003. So I was just wondering when these unexpected results were discovered. The unexpected results are all in the application. I understand what you're talking about. I'm just simple-minded person. I see that your case turns on being able to have these unexpected results not known in 2008, and you just agreed that yes, it is necessarily so, and yet in the same appendix you give me, it says we knew about this in 2007. I think we need to look at what the filing dates are specifically of the patent and the application. And then what's the reference to the formalin test on page 85, J85? The formalin test. I'm not sure what the formalin test was specifically. Go to page J, section 1-4, which is the 871 patent, and it describes, Virgil is describing the results of the formalin test in 2003, which is five years before 2008. Well, there were tests with the mouse version of the opiorphan and the human version, which there may be some distinction in terms of which test you're talking about. Well, don't you think it's important for us to be able to figure out when these unexpected results were discovered? Well, I think that if you look at the declaration, it is saying... I'm sorry, just to interrupt, the appendix page 614, which is column 32 of the 871, seems to be specifically talking about a formalin test with rats. Right. I'm not sure that the formalin test really has anything to do with the pharmacodependence and the tolerance. Well, I don't know either. Specifically? Right, but that comes back to appendix 85, which is in your application, which Judge Right, and I think that that's this application. Proceedings of the Fourth International Peptide Symposium. I assume that was published in Australia. I have those proceedings. It would have been helpful, I'm going to add, if you had the paper versions, we'd be losing many fewer seconds. I just was concerned because it looked to me like there was a disconnect between page 485 and the record and page 408 of the record. I don't think there is. I think that... I know, but facially there is, because 4085 says we discovered these unexpected results 2007. Yes, and I think that's part of this application, that those were incorporated into this application when it was filed, as opposed to being in the earlier application. I think it's after the filing date of the patent itself. So those results are not in the patent. So I don't think there's any inconsistency. I'd have to run through and look at all of the data, and that would certainly take some time to do. But I think that we have unexpected results. You're into your rebuttal time now? Let me, I'd like to save that for rebuttal. Thanks. Ms. Capra. Good morning, Your Honors, and may it please the Court. The Board correctly determined that Representative Claim 35 is unpatentable for offices-type double patenting over the claims of the 871 patent. I would like to turn you to APPX 530, where the examiner discussed the unexpected results at issue here. The examiner explained that these so-called undisputed facts that the appellant pointed to only demonstrates the beneficial effects of opioid orphan as compared to morphine. And perhaps maybe that was unexpected, but appellant failed to demonstrate that these benefits are unexpected as compared to the closest prior art, which, as Your Honors have recognized, are the claims of the 871 patent, which also do recite treating pain with opioid morphine. And the Board and the examiner found that because the application not only claims, describes dosages that overlap with those of the pending claims, that treating a patient with the same compound for the same pathology would result in the same types of properties of not inducing pharmacokinetic intolerance. So to answer this question, it seems to me there are two different ways of formulating and I think your brief uses both of the different ways of formulating the comparison. One is to say that what is claimed here, which is a particular negative effect, was true of the prior art, too. And the other is to say, well, once you've narrowed the steps, there are these slightly additional constraints on the dosage and the length of time and the dailiness, that whatever the effects are of this were also the effects of the previous one. And that second way of saying it doesn't require anybody to have appreciated those facts at the earlier time. How do we think about that? So both of those are true. And no matter what... So you're not contending that the Board found or the examiner found that it was recognized at the time of the 871 that there would be an absence of pharmacodependence and an absence of tolerance? We did not contend that, Your Honor. We simply said that because there was no patentable distinction between the claims of the 871 patents and the claims that are pending today, that any resulting pharmacodependence or tolerance in a patient would have been expected from both of those or would have been the natural result of both of those method claims being practiced. Suppose it were the case that the narrowing of the class of steps taken, the body-dependent dosage, the dailiness, the extent of time, that the beneficial lack of tolerance, lack of pharmacodependence was an important reason to narrow to those particular set of constraints. Would the analysis be different? Perhaps if a pellant had shown a superior type of property within the patient at a particular dosage for a particular duration, perhaps then there could have been some criticality to that species within the broad genus that they claimed in the prior claims. But here, that simply wasn't shown. The only data that was shown was that in comparison to morphine, which is an entirely different product, that there was some unexpected showing of pharmacodependence. So the Rougeau, Rougeau or Rougeau? Rougeau, I believe, but you may have to ask a pellant. Declaration at Appendix 444 says we get these good effects in this particular treatment regimen, but it doesn't say we don't get those good effects in other variations of the treatment regimen that also would fall within the broader genus. That's correct. That's correct. And there simply has been no showing of any unexpected results here. And the prior claims are pretty broad, as a pellant even concedes in both their opening and reply brief. And those broad claims, perhaps this property within the patient may have been exhibited even at different dosages and different ranges. So there simply isn't any showing of criticality of the specific claims that are at issue here. And as the board and examiner found, there is no pathological distinction between these claims. And if there are no further questions, I yield the rest of the time. Thank you. Can you address that last point, which I guess certainly has struck me in this case, trying to figure out how one thinks about this inherency question with a previously unknown property and how that fits with a large body of case law about identifying species within earlier genus claims? Why isn't it evident right here about being critical that there's no criticality as to these particular properties of the particular narrowing of the actual acceptance of the method? Well, I think if you look at the case law in Ray Kaplan, if you start with a very large genus, the species within that genus are not necessarily obvious. You have to get to those species to start with. So that's really the first part of this that I think that the PTO has simply waved their hands and said, well, it encompasses. And encompasses is not the law. Encompasses doesn't give you the law. I think the examiner in the court did more than that. It said, when you look at these particular numbers and think about what an average person weighs and that this would actually, even if you were not thinking about these pharmacode dependence and tolerance properties, a skilled artisan would readily get to these particular constraints. And that's where the unexpected results come in. And they have to be considered before reaching the conclusion of obviousness. And that's not what the PTO does. I mean, if you look at what the PTO says, it says that this is just like Baxter, mere recognition of a latent property in an obvious method. So they said it's an obvious method. And then they say, well, take a look at this. It's inherent in the obvious method. Of course it's inherent in the obvious method, our method, because they've already reached obviousness without looking at unexpected results. You have to look at the unexpected results first to figure out if it's obvious. If you don't, it's always, unexpected results are always going to be inherent, 100% of the time, because you've already reached obviousness before considering. It's part of the obviousness analysis to get there. They have to be considered first. Otherwise, unexpected results would never get you anywhere. Here we have very good unexpected results. They are lining up almost perfectly with our claims in terms of the dosages that we used. And the PTO hasn't challenged any of the unexpected results whatsoever. They've said, in fact, they seem to agree with them. Perhaps they're unexpected with respect to morphine. And our position has always been, morphine is the appropriate comparison. Because the prior art is just this giant genus, and no one within that genus ever did anything that would have shown this unexpected result. But are you suggesting that the unexpected results in this case should be considered and reflected in the prima facie case analysis of 103, but not as secondary considerations, because they have been proven to be non-improvements of the nearest prior art? It looks to me like the nearest prior art issue traps your second, traps your unexpected results as secondary considerations. I don't think so. I think expectations come in at both levels, certainly. There's a difference between, I mean, I think your argument is basically that Honeywell suggests that you take a look at the unexpected results as part of the prima facie case. I think they have to be, you might be able to make a prima facie case, but that's not the end. You have to really get to obviousness. You have to look at everything. Are you suggesting that we should appreciate the unexpected results in the 103 analysis, in this case, as part of the prima facie case, or as part of secondary considerations after we have reached a prima facie case? I think you really, in this particular case, need to look at them at both levels, because we're talking about expectations of the skilled artist. But if the nearest prior art is the 871 patent, and if it's so that the unexpected results were to be expected, were inherent in the practice of the 871, well, that's neutering the effect of the secondary considerations. I don't think you could say that they are inherent. I mean, if this were a straight anticipation inherency case, why isn't there a 102 rejection? Isn't that what the case is about? It's obviousness. The case is about obviousness, not about 102. They couldn't make, the PTO could not make a 102 rejection, so they're relying on obviousness. Once they do that, they have to take into consideration unexpected results, the expectations of the skilled artist, and even reaching the factory official case. How do you do it once you have decided that these unexpected results were inherent in the practice of the previous patent? If they were inherent... That's a finding in this case, correct? No, it's not. The inherency, if you look at it, it's mere recognition of a latent property. In other words, inherency in an obvious method. So they're reaching obviousness first, and then saying that our unexpected results are inherent, not in the prior art, but in our method. And that's the wrong application of the law. That can't be done. I mean, I think all of the law that's been cited by either the PTO or by us would go against that result. Thanks very much. Thank you very much. Thanks to all of us. The case is submitted.